**In re the STATE of Texas, Relator.**

No. 08–03–00004–CR.

Court of Appeals of Texas,
El Paso.

Aug. 28, 2003.

Bonnie Rangel, El Paso, for respondent.

Jaime E. Esparza, District Attorney, El Paso, for relator.

Before Panel No. 2 BARAJAS, C.J., McCLURE, and CHEW, JJ.

## *OPINION*

ANN CRAWFORD McCLURE, Justice.

This is an original proceeding in mandamus. The State of Texas, Relator, seeks a writ of mandamus requiring the Honorable Bonnie Rangel, Judge of the 171st District Court of El Paso County (Respondent), to vacate an order permitting William Dean Gray or his representatives to search the records and property room of the El Paso Police Department. For the reasons stated below, we conditionally grant mandamus relief.

## UNDERLYING FACTS

On October 31, 1991, William Dean Gray was convicted of aggravated sexual assault of a child in the 171st District Court of El Paso County and sentenced to imprisonment for ninety-nine years.[1] According to our opinion and the reporter's record from the original appeal,[2] the complainant was at home alone on the night of November 17, 1990 when a man entered her home. *Gray v. State*, slip op. at 1. At trial, the

---

1. The case was styled *The State of Texas v. William Dean Gray* and the trial court cause number was 61540. This Court affirmed Gray's conviction in an unpublished opinion. *See William Dean Gray v. State*, No. 08–91–00396–CR (Tex.App–El Paso April 21, 1993, pet. ref'd)(not designated for publication).

2. On our own motion, we have reviewed the appellate record to determine whether any of the evidence might be located in the exhibit volume. We have also reviewed relevant portions of the reporter's record. We are aware

of the general rule prohibiting consideration of another appellate record to supply missing evidence where the appellate record has not been introduced and the parties have not asked the court to take judicial notice of it. In this case, however, the witnesses below discussed the appellate record and the exhibits admitted into evidence in the original trial. Further, the details of the underlying offense related in our opinion are not determinative of the issues before us but are simply provided as background information.

complainant identified Gray as her assailant. The complainant ran to the kitchen and grabbed a knife but Gray forced her to drop the knife. He then sexually assaulted her on the floor of the kitchen. Gray became frightened by the complainant's dog and he got up and zipped his pants. As Gray tried to leave, the dog attacked him. The complainant, who was still on the floor, picked up the knife and stabbed Gray in the area of his lower legs. After Gray left, the complainant became sick and went into the bathroom where she accidentally dropped the knife into the toilet. A friend called 911 for Gray and an ambulance soon arrived. Photographs taken at the scene showed a knife in two of the photos but the knife was not collected as evidence or submitted for laboratory analysis.

Detective Millie Williams prepared three different photographic lineups and showed them to the complainant. The complainant did not identify anyone from the first two lineups but she tentatively identified Gray from the third. Gray was not in either of the first two lineups but he was in the third lineup. During a later physical line-up, the complainant made an unequivocal identification of Gray as her assailant.[3]

Gray testified in his own defense and denied sexually assaulting the complainant. During his testimony, Gray's attorney had him put on shorts and show his legs to the jury. On cross-examination, Gray admitted that he had a scar on his left leg but continued to deny that he had assaulted the complainant.

On April 16, 2002, Gray filed a motion for forensic testing under Chapter 64 of the Code of Criminal Procedure. Three days later, Respondent entered an order requiring the State to produce all of the physical evidence in the case, including four items of evidence specified in the order: (1) the knife used by the complainant against the assailant; (2) the "rape kit" collected from the complainant; (3) the pants and underwear worn by the complainant; and (4) the chain of evidence documents on each piece of evidence produced in response to the order. If the State could not produce the evidence by May 16, 2003, it was required to explain the reasons in writing and appear at a show cause hearing on that same date to present the written response.

The State appeared at the scheduled show cause hearing and offered the live testimony of two witnesses, Albert Leal and Bob Lynch, in lieu of a written response to explain why it had not located the evidence. It also admitted into evidence eleven chain of evidence forms pertinent to the Gray case. Bob Lynch, who is employed as an investigator with the District Attorney's Office, conducted an investigation into the disposition of the evidence in this case. He first checked with the El Paso Police Department Property Office to determine whether that office held any of the evidence. He spoke with a property clerk, Connie Hernandez, and she was unable to find any record of the case. Lynch then went to the District Clerk's Office to determine whether the evidence was located there. The District Clerk's Office did not find any record of the evidence being held in that office. Lynch also spoke with Mike Fan who is the district clerk's custodian of evidence which has been introduced in any district court case In Lynch's presence, Fan conducted a physical search of the archives but was unable to locate any of the evidence. Lynch next asked David Burks, the court reporter who transcribed the trial, to review the reporter's record in an effort to locate the evidence. With the aid of the reporter's record,

**3.** State's Exhibit 9 was a photograph of the physical lineup.

Burks showed Lynch that none of the four items of evidence which had specifically been ordered to be produced had been introduced into evidence at trial.[4] Lynch then contacted the Police Department's property office again. On this occasion, he spoke with Albert Leal, the property custodian. Leal had found the chain of evidence documents on file in the property office. Lynch made a copy of the documents and noticed that the knife referred to in the order had never been booked into evidence. Further, he reviewed the police reports associated with the case and learned that a knife had not been picked up at the crime scene.

Albert Leal is employed by the El Paso Police Department as a property disposition specialist. He conducted a physical search of the entire property office in an effort to locate the evidence from the Gray case but was unsuccessful.[5] There are two storage boxes located at the Pebble Hills Regional Command Center where additional property is stored and the contents of those boxes are stored in a computer file. Leal did not locate the case number or property in that computer file; consequently, he did not physically search the two storage boxes. Based upon his search, Leal concluded that the police department did not have control of the evidence. He did not know what had happened to the evidence since no order for destruction had ever been presented and there was no entry in the log books or computer to indicate that the property had ever been destroyed. He did note that a knife had never been booked into evidence.

At the conclusion of the hearing, the trial court ordered that Leal and Lynch perform a physical search for the evidence at the two storage bins located at the Pebble Hills Regional Command Center.

4. Our review of the appellate record reflects that the reporter's record, including the exhibit volume, was filed in this Court on January 3, 1992. The State offered sixteen exhibits into evidence at Gray's trial. The exhibit volume, however, contains only State's Exhibit 7 which is a copy of "Medical Report Alleged Child Sexual Assault," State's Exhibit 8 which is a copy of a lab report by the Texas Department of Public Safety, and Defendant's Exhibit 1 which is a copy of a composite drawing of the man who assaulted the complainant. State's Exhibits 1 through 6 and 11 through 15 are photographs, State's Exhibit 9 is a photo lineup, State's Exhibit 10 is a map, and State's Exhibit 16 is a pen packet. According to a statement made by the court reporter found on the second page of the exhibit volume, all other exhibits were in the custody of the District Clerk's Office. State's Exhibit 8, which is dated February 26, 1991, pertains to a laboratory analysis of Gray's blood, semen, saliva, pubic hair, and fingernail clippings. These items were submitted and compared to slides and swabs obtained from the complainant during the sexual assault examination. Blood, hair, and fingernail clippings taken from the complainant were also analyzed. State's Exhibit 8, which is addressed to Detective Millie Williams of the El Paso Police Department, states, "We are unable to retain this evidence in our vault. Please make arrangements for this evidence to be picked up at your earliest convenience. If this evidence can be destroyed, please complete and return the enclosed disposition letter authorizing its destruction." Testimony adduced at the hearing held on October 30, 2002 established that the evidence referenced in State's Exhibit 8 was subsequently returned to the El Paso Police Department.

5. The offense occurred on November 17, 1990 and several items were booked into evidence between November 18, 1990 and June 28, 1991. On October 28, 1991, the following items of evidence were released to the District Attorney's Office: 1 line-up card, 1 warrant to search person, 1 affidavit, 1 photo line-up (5 photos), 1 rape kit, 1 photo line-up, 1 yellow sweat pants, 1 yellow sweat top, 2 white socks, 1 set of white panties, 1 pink bra, 6 chain of evidence documents. On November 4, 1991, the District Attorney's Office returned the following items to the property office: panties, pink bra, white socks, rape kit, the yellow sweats (top and bottom), and a hospital wrist band.

On May 17, 2003, the State filed a sworn written response asserting that Lynch and Leal had conducted the search of the bins and did not locate the evidence. On August 14, 2002, Gray filed a "Motion to Inspect Premises and Records" requesting permission for his attorneys or other representatives to inspect the records of the District Clerk's Office and El Paso Police Department, including its property offices in order to look for the evidence themselves. Respondent conducted a hearing on that motion on October 30, 2002. The State offered the testimony of two additional witnesses, Louis Alvidrez and Jorge Valenzuela.

Louis Alvidrez is the supervisor of the El Paso Police Department property office. When he became supervisor of the department in 1996, Alvidrez determined that the property office should purge the cases that had already been adjudicated by the District Attorney's Office. The property office purged all adjudicated cases from 1980 through 1997. Pursuant to relevant statutes, the property office disposed of the property from these cases by returning the property to the owner, destroying the property, or by submitting cash to the comptroller's office. The property from the remaining 1990 cases was moved to the two metal storage units at Pebble Hills. If the evidence from the Gray case still existed, it should be located there. In response to direct questioning by Respondent, Alvidrez reiterated that the evidence was not in the Pebble Hills storage units as he, Lynch, and Leal had personally searched for the evidence. Alvidrez had personally conducted three searches for the evidence and had not located it. According to Alvidrez, it was also possible that the evidence had been destroyed but no notation made on the property records. He conceded that it was also possible that the evidence still existed.

Sergeant Jorge Valenzuela is an administrative sergeant with the El Paso Police Department. He oversees activities in several offices including the property office. When he learned that the evidence from the Gray case could not be located, he investigated whether it could be misfiled under another case number. Valenzuela learned that another case number was connected to the Gray case and he searched for the evidence under that number but did not find anything. He also verified that the DPS Laboratory in Lubbock did not have any of the evidence.

On December 17, 2002, Respondent granted the motion and signed an "Order to Permit Representative of the Defendant to Examine the Property Room of the El Paso Police Department for Evidence Pursuant to Chapter 64 of the Texas Code of Criminal Procedure." The State filed a petition seeking mandamus relief.

## NO AUTHORITY TO ORDER SEARCH

The State asserts that the trial court had no authority to order a search of the police department property office, and therefore, it has a clear right to the relief sought. Additionally, the State argues that it has no ability to challenge the trial court's order by appeal.

### Standard of Review

To establish an entitlement to mandamus relief, a relator must satisfy two requirements: (1) there must be no adequate remedy at law to redress his alleged harm; and (2) the relator must have a clear right to the relief sought. *Buntion v. Harmon*, 827 S.W.2d 945, 948 and n. 2 (Tex.Crim.App.1992); *State ex rel. Sutton v. Bage*, 822 S.W.2d 55, 57 (Tex. Crim.App.1992). The second element has historically been stated in terms of requir-

ing that the judicial conduct from which relief is sought be "ministerial" in nature. *Buntion,* 827 S.W.2d at 948 n. 2. An act is ministerial "where the law clearly spells out the duty to be performed ... with such certainty that nothing is left to the exercise of discretion or judgment." *Texas Dept. of Corrections v. Dalehite,* 623 S.W.2d 420, 424 (Tex.Crim.App.1981). A ministerial act is not implicated if the trial court must weigh conflicting claims or collateral matters which require legal resolution. *State ex rel. Hill v. Court of Appeals for the Fifth District,* 34 S.W.3d 924, 927 (Tex.Crim.App.2001). However, a so-called "discretionary" act may become "ministerial" when the facts and circumstances dictate but one rational decision. *Buntion,* 827 S.W.2d at 948 n. 2.

### No Adequate Remedy at Law

Gray does not dispute that the State lacks an adequate remedy by appeal. Article 44.01 of the Texas Code of Criminal Procedure does not authorize an appeal by the State of the trial court's order. *See* TEX.CODE CRIM.PROC.ANN. art. 44.01 (Vernon Pamph.2003); *State v. Patrick,* 86 S.W.3d 592, 594 (Tex.Crim.App.2002). Further, the right to appeal provided by Article 64.05 is limited to an appeal of a finding made by the convicting court under Articles 64.03 and 64.04. *See Patrick,* 86 S.W.3d at 594; TEX.CODE CRIM.PROC.ANN. art. 64.05. Because the State cannot appeal the trial court's order, the State has no remedy available to it other than a writ of mandamus. *See Patrick,* 86 S.W.3d at 594 (where convicting court determined that inmate failed to meet statutory requirements for forensic testing at state expense, but ordered forensic DNA testing at inmate expense, State could not appeal the order but could only obtain review by mandamus).

### Clear Right to Relief Sought

■ Even though Gray takes issue with the notion that this case raises a discovery issue, our analysis necessarily begins with a discussion of the limitations on a criminal defendant's right to discovery. This right under the United States Constitution is limited to exculpatory or mitigating evidence in the State's possession, custody, or control. *See Dickens v. Court of Appeals for the Second Supreme Judicial District,* 727 S.W.2d 542, 551 (Tex.Crim.App.1987); *King v. State,* 746 S.W.2d 515, 517 (Tex. App.-Dallas 1988, pet. ref'd). Beyond this, a criminal defendant has no general right of discovery. *Washington v. State,* 856 S.W.2d 184, 187 (Tex.Crim.App.1993); *Perkins v. State,* 902 S.W.2d 88, 101 (Tex. App.-El Paso 1995, pet. ref'd). Article 39.14 of the Texas Code of Criminal Procedure provides the defendant with a limited right of discovery prior to and during trial. TEX.CODE CRIM.PROC.ANN. art. 39.14 (Vernon Pamph.2003); *see Martin v. Darnell,* 960 S.W.2d 838, 841–42 (Tex.App.-Amarillo 1997, orig. proceeding); *State ex rel. Wade v. Stephens,* 724 S.W.2d 141, 143–44 (Tex. App.-Dallas 1987, orig. proceeding). Upon motion by the defendant showing good cause, the trial court may order the State to produce certain evidence material to any matter involved in the action which is within the State's possession, custody or control. TEX.CODE CRIM.PROC.ANN. art. 39.14.

■ No court has held that the State's obligation to disclose exculpatory and mitigating evidence in its possession authorizes a trial court to order a search by the defendant of a law enforcement agency's evidence room. To the contrary, the Supreme Court explained in *Pennsylvania v. Ritchie* that a defendant's right to discover exculpatory evidence does not include the unsupervised authority to search through the government's files. *Pennsylvania v.*

*Ritchie,* 480 U.S. 39, 59–60, 107 S.Ct. 989, 1002, 94 L.Ed.2d 40 (1987); *see also Weatherford v. Bursey,* 429 U.S. 545, 559, 97 S.Ct. 837, 846, 51 L.Ed.2d 30 (1977)("There is no general constitutional right to discovery in a criminal case, and *Brady* did not create one."). It follows that a defendant's right to discover exculpatory evidence likewise does not include a post-conviction search of the police department's property room for DNA evidence. By its own terms, Article 39.14 applies exclusively to pretrial and trial discovery. *See* Tex.Code Crim.Proc.Ann. art. 39.14 ("Upon motion of the defendant showing good cause therefor and upon notice to the other parties, the court in which an action is pending may order the State before or during trial of a criminal action therein pending or on trial to produce and permit the inspection and copying or photographing by or on behalf of the defendant....").[6] Authorization for the Respondent's order, if it exists, must be found in Chapter 64 of the Code of Criminal Procedure.

Article 64.01 provides that a convicted person may submit to the convicting court a motion for forensic DNA testing of evidence containing biological material. Tex. Code Crim.Proc.Ann. art. 64.01. On receipt of the motion, the convicting court shall provide the State's attorney with a copy of the motion and require the State's attorney to deliver the evidence to the court or explain in writing to the court why the state cannot deliver the evidence. Tex.Code Crim.Proc.Ann. art. 64.02. Article 64.03 establishes the requirements for ordering DNA testing:

(a) A convicting court may order forensic DNA testing under [Chapter 64] only if:

(1) the court finds that:

(A) the evidence:

(i) still exists and is in a condition making DNA testing possible; and

(ii) has been subjected to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material respect; and

(B) identity was or is an issue in the case; and

(2) the convicted person establishes by a preponderance of the evidence that:

(A) a reasonable probability exists that the person would not have been prosecuted or convicted if exculpatory results had been obtained through DNA testing; and

(B) the request for the proposed DNA testing is not made to unreasonably delay the execution of sentence or administration of justice.

Tex.Code Crim.Proc.Ann. art. 64.03.

The State, citing *State v. Patrick,*[7] argues that Chapter 64 does not expressly authorize Respondent to enter such an order, and therefore, she acted without jurisdiction or authority. Gray counters that because the convicting court is required to find whether the State's explanation regarding the location of the evidence is adequate and whether the evidence still exists before ordering forensic DNA testing, the court has inherent authority to order a search for the evidence. He also asserts that this is an implied power based upon the express grant of authority in Articles 64.02(2)(A)(B) and 64.03(a)(1)(A)(i). According to Gray, if the convicting court finds the State's explana-

---

**6.** Article 39.14 is found in the portion of the Code of Criminal Procedure governing "Trial and Its Incidents."

**7.** *State v. Patrick,* 86 S.W.3d 592 (Tex.Crim. App.2002).

tion unsatisfactory or if the court believes the State has not made a diligent search for the evidence, the court has inherent power to fashion an appropriate remedy.

The jurisdiction of a particular court is that portion of the judicial power which it has been expressly authorized to exercise by the constitution or statutes. *Eichelberger v. Eichelberger*, 582 S.W.2d 395, 398 (Tex.1979). In addition to the express grants of judicial power to each court, there are other powers which courts may exercise though not expressly authorized or described by constitution or statute. *Id.; see State v. Johnson*, 821 S.W.2d 609, 612 (Tex.Crim.App.1991)(citing *Eichelberger* with approval). These powers are generally categorized as "implied" and "inherent." *Eichelberger*, 582 S.W.2d at 398. While Gray refers in his brief to both inherent and implied authority, there is an important distinction between implied and inherent powers. *See id.*

The inherent judicial power of a court is not derived from legislative grant or specific constitutional provision, but from the very fact that the court has been created and charged by the constitution with certain duties and responsibilities. *Id.* The inherent powers of a court are those which it may call upon to aid in the exercise of its jurisdiction, in the administration of justice, and in the preservation of its independence and integrity. *Eichelberger*, 582 S.W.2d at 398; *see Johnson*, 821 S.W.2d at 612. Texas courts have recognized inherent powers in the following instances: to change, set aside or otherwise control their judgments; to summon and compel the attendance of witnesses; to regulate the admission and practice of law; and to provide personnel to aid the court in the exercise of its judicial function. *Eichelberger*, 582 S.W.2d at 399 n. 1 (and cases cited therein). The implied powers of a court do not stand on an independent basis as do inherent powers. *Id.* at 399. Though not directly or expressly granted by constitutional or legislative enactment, implied powers are those which can and ought to be implied from an express grant of power. *Id.*

The proper exercise of either inherent or implied authority assumes that the court has subject-matter jurisdiction in the first place. When a conviction has been affirmed on appeal and the mandate has issued, general jurisdiction is not restored in the trial court. *State v. Patrick*, 86 S.W.3d at 594. The trial court has special or limited jurisdiction to ensure that a higher court's mandate is carried out and to perform other functions specified by statute, such as finding facts in a habeas corpus setting, or as in this case, determining entitlement to DNA testing. *Id.*

With this understanding, we will now address the parties' respective arguments. The State relies substantially on the holding in *State v. Patrick*. There, a defendant whose capital murder conviction had been affirmed on appeal sought DNA testing of spermatozoa specimens in the possession of the State. *Id.* at 593. The convicting court found that the defendant had failed to establish by a preponderance of the evidence that there exists a reasonable probability that the defendant would not have been prosecuted or convicted if exculpatory results would have been obtained through DNA testing. *Id.* at 593. The court denied the request for DNA testing at the State's expense under Chapter 64 but still ordered the DNA testing as Patrick indicated that he would pay for it. *Id.* at 593–94. There was overwhelming evidence that Patrick committed the murder. *Id.* at 594. Patrick's attorney conceded that the testing would not benefit his client but Patrick wanted the testing simply be-

cause he could not remember committing the murder. *Id.* The Court of Criminal Appeals granted mandamus relief because the convicting court did not have subject-matter jurisdiction to order DNA testing outside of Chapter 64. *Id.* at 595. Further, the Court expressly rejected an argument that the convicting court had "inherent jurisdiction" and authority to order the DNA testing. *Id.* at 596. "Jurisdiction cannot be 'inherent;' it is conferred by constitution or by statute." *Id.* The Court acknowledged that a convicting court may have inherent powers as a result of the limited jurisdiction granted it by Chapter 64, but those inherent powers ended when the court signed the order denying testing under Chapter 64. *Id.*

We find *Patrick* instructive but distinguishable. There, the convicting court's limited jurisdiction terminated upon determining that Patrick was not entitled to forensic DNA testing because he had failed to establish his entitlement as required by the statute. Therefore, the court lacked subject-matter jurisdiction to order DNA testing on some basis other than Chapter 64. In the absence of subject-matter jurisdiction, the convicting court also lacked inherent or implied power to enter the order. Here, Respondent has not yet ruled upon Gray's motion, and therefore, she retains subject-matter jurisdiction. The question remaining is whether Respondent has either inherent or implied power to enter this order.

The order at issue does not invoke one of the generally-recognized inherent powers discussed in *Eichelberger*. *See Eichelberger*, 582 S.W.2d at 399 n. 1. Gray cites no cases that Respondent has inherent power to enter this type of order in the context of Chapter 64. In fact, Gray's attorneys readily admitted in the hearings held before Respondent that, to their knowledge, no court had previously entered such an order. In the absence of any supporting authority, we conclude that Respondent's order is not based on an inherent power.

In considering whether Chapter 64 impliedly authorizes Respondent's order, we are mindful that the convicting court has limited jurisdiction to consider only those matters contained in the statute. The statute clearly places the burden on the State to produce the evidence or offer an explanation to the convicting court why it cannot do so. *See* Tex.Code Crim. Proc.Ann. art. 64.02(2)(B). The State has complied with the statute and offered testimony showing that it is unable to produce the evidence—it has likely been destroyed without documentation or perhaps it has been lost. Gray asserts that Respondent has implied authority to evaluate the adequacy of the State's explanation made pursuant to Article 64.02(2)(B) since she must make a factual finding whether the evidence still exists. While we agree that Respondent has implied authority to evaluate the explanation provided for failure to produce the evidence, we do not agree that Respondent is impliedly authorized to enter an order allowing Gray's representatives to personally search the property room. If a convicting court finds that the State has not exercised due diligence in attempting to locate the evidence, the court certainly has implied authority to order those responsible for the safekeeping and custody of the evidence to conduct a further search. Respondent did just that when she ordered the El Paso Police Department to conduct a physical search of the two storage containers located at Pebble Hills. The search was performed pursuant to her order and the evidence still was not located.

In support of his argument that Respondent is authorized to allow his representatives to personally conduct a search of the

evidence room, Gray cites several examples from other jurisdictions where DNA evidence initially could not be located but was found after an extended search. In each of those cases, however, the government officials responsible for safekeeping and custody of the evidence eventually found it. It is one thing to order the police department or other law enforcement agency to conduct an additional search to locate the evidence and another thing entirely to allow the defendant to conduct the search himself. Allowing the convicted person access to the evidence stored in an evidence room would break the chain of custody. Consequently, the convicting court would not be able to make a finding that the evidence has been subjected to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material respect. *See* TEX.CODE CRIM.PROC. ANN. art. 64.03(a)(1)(A)(ii). Additionally, it would open the State to claims in all of its cases that the chain of custody had not been properly maintained or that evidence has been contaminated. We conclude that the power assumed by Respondent is not and should not be implied from the grant of power in Chapter 64. Because Chapter 64 does not expressly or impliedly authorize a convicting court to order that the convicted person's attorneys, investigators, or other representatives be allowed to conduct a search of a law enforcement agency's evidence room in order to locate DNA evidence, we sustain the State's sole issue and conditionally grant the relief sought. The writ of mandamus will issue only if Respondent fails to vacate her order.